NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0248n.06

Case Nos. **11-5829; 11-5837; 11-5860; 11-6191; 11-6192; 11-6196; 11-6198**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Apr 01, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| KELLY MILLER, ADRIAN DORSEY, LEE | ) | TENNESSEE |
| CARR, SUNNAH MADDOX, RONNIE | ) | |
| COOPER, KEITH PARIS RUFFIN, and | ) | |
| JASON PETER DEJESUS, | ) | |
| | ) | |
| Defendants-Appellants. | | |

_____/

**BEFORE:  MERRITT, SUTTON, and STRANCH, Circuit Judges.**

**MERRITT, Circuit Judge.**  After a ten-day trial, a jury convicted Defendant-Appellants Kelly Miller, Adrian Dorsey, Lee Carr, Sunnah Maddox, Ronnie Cooper, Keith Ruffin, and Jason DeJesus of various drug-trafficking, money-laundering, witness-intimidation, and ammunition offenses.  Except for Miller, all the defendants challenge their convictions; because we find their arguments unconvincing, we **AFFIRM** these convictions.  The defendants, all except for Dorsey, also challenge their sentences.  Because DeJesus and Ruffin are eligible for resentencing under *Dorsey v. United States*, 132 S. Ct. 2321 (2012), we **REMAND** their cases for resentencing; however, the remainder of the defendants' sentences are **AFFIRMED**.

## I.     BACKGROUND

This case focuses on a drug-trafficking scheme operated by Maddox from 2003 to 2009. The primary thrust of the drug-trafficking operation was to purchase kilogram quantities of cocaine, cook it into crack cocaine, and resell the drugs in smaller quantities. The operation was based in Johnson City, Tennessee—where Maddox lived with co-defendant Jamie Rush—but reached to suppliers and activities in Georgia, Florida, and New York. In order to reach these out-of-state suppliers, Maddox and Rush would hire women as couriers to transport money and drugs; in addition, various members of the operation would send wire transfers through Western Union to these different locations.

The operation came to the attention of local DEA agents in February 2008 when they arrested Shawn McGirt, a drug dealer, who told the agents that Maddox was his supplier. The agents set up a transaction between McGirt and Maddox, and obtained a Title III wiretap on Maddox's phone that ultimately generated 25,000 intercepted communications.

Based on their investigation, law enforcement officers arranged two sets of actions. In January 2009, they orchestrated a traffic stop to catch Maddox, Rush, and a female courier en route to Atlanta to purchase a kilogram of cocaine. The officers found $31,500.00 in cash in the courier's car. Then, on May 7, 2009, officers coordinated a search of Maddox and Rush's residence with a traffic stop of their vehicle as they returned from another drug purchase in Atlanta. At the residence, officers arrested Miller and Dorsey, and courier Taneka Ebberts, who had returned from Atlanta ahead of Maddox and Rush. A search of the rental car Ebberts had driven to Atlanta uncovered about one and a half kilograms of cocaine and 67 grams of marijuana in the trunk. Maddox and Rush were also arrested.

On July 13, 2010, a grand jury in the Eastern District of Tennessee returned a Third Superseding Indictment against Maddox, Rush, Carr, Miller, Dorsey, Cooper, DeJesus, Ruffin, and others on twenty counts of: conspiracy to distribute and possess with the intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (Count 1); aiding and abetting the distribution of 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 18 U.S.C. § 2 (Count 2); conspiracy to distribute and possess with the intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D) and 846 (Count 3); aiding and abetting the distribution of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D), and 18 U.S.C. § 2 (Count 4); conspiracy to distribute and possess with the intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (Count 5); conspiracy to launder money, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h) (Count 6); distribution of cocaine and cocaine base and the aiding and abetting of cocaine base distribution, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)–(C) (Counts 8 and 15); manufacturing and the attempt to manufacture 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846 (Count 12); aiding and abetting of money laundering, in violation of 18 U.S.C. §§ 2 and 1956(a)(1)(A)(i) (Count 13); unlawful possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (Count 16); and witness intimidation and conspiracy to commit witness intimidation, in violation of 18 U.S.C. §§ 371, 1512(b)(1), and 1513(b)(2) (Counts 18, 19 and 20).

At trial, Rush and several other indicted co-defendants testified for the prosecution. Rush explained that he was introduced to Maddox as a homeless teenager in Utica, New York, and that he immediately began dealing and operating two crack houses for Maddox there. By 2004, Maddox decided to move the operation to Johnson City with Rush, and they began procuring

about 1.5 kilograms of powder cocaine per month and cooking it into crack cocaine to sell. This amount eventually increased to one kilogram every week or two from a source that Maddox found in Atlanta.

While Maddox generally did the cooking himself, Rush testified that he personally cooked at least forty kilograms of cocaine into crack cocaine for Maddox. According to Rush, Maddox kept the profits from drug sales and provided Rush with cars, cash, jewelry, computers, and cell phones.

Rush also testified that Carr, Dorsey, Miller, and DeJesus all played a role in Maddox's operation and stayed at Maddox's apartment in Johnson City at various times. According to Rush, Carr—Maddox's cousin—moved to Johnson City from Florida to help Maddox with drug sales, though his role evolved to cooking crack cocaine and locating and buying from cocaine suppliers in Florida. Eventually, Carr began his own drug business relying on Maddox as a supplier, according to Rush. Maddox also brought Dorsey and Miller from New York to sell drugs in 2006, according to Rush, and was in the process of securing a stash house for them to operate down the street from Maddox's apartment when the group was arrested.

As for Cooper, Maddox's brother-in-law, a jailhouse informant testified that Cooper told the informant he was part of Maddox's operation to purchase cocaine in kilogram quantities for resale in Tennessee. Another informant testified that he had witnessed Cooper selling cocaine in Utica, New York, where Cooper lived.

In addition, various law enforcement officers testified about (1) intercepted phone calls and text messages, (2) recordings made by informants transacting with defendants, (3) the coded language the defendants employed when communicating, and (4) financial transactions through Western Union that officers traced to the defendants. The intercepted communications included

numerous phone calls and text messages between Maddox and Cooper, and Maddox and DeJesus, among others.

For instance, in August 2008, Maddox had been sold fake cocaine and had started to sell marijuana to stay in business, according to Rush. A recording of Carr by an informant posing as a cocaine supplier corroborated the testimony regarding the fake cocaine. Carr told the informant he had recently lost money after he and his cousin purchased fake cocaine that would not cook properly, and expressed an interest in buying kilograms of cocaine from the informant.

Though DeJesus had stayed in Tennessee for only a short period of time to sell marijuana before returning to New York, according to Rush, intercepted communications showed that he sold Maddox cocaine and tried to help Maddox cook it into crack cocaine in September and October 2008 when Maddox was in New York.

Finally, as to Ruffin, the jury heard multiple recordings of phone calls and transcripts of various text messages between him and Maddox explicitly discussing the sale of large quantities of cocaine, as well as testimony by a DEA agent regarding incriminating statements Ruffin made to the agent after his arrest.

Based on this evidence and the testimony of several dozen witnesses, the jury convicted the defendants on various counts, including some lesser-included offenses. The defendants filed motions for judgment of acquittal or new trial, which the district court denied. It then sentenced Maddox to life imprisonment; Cooper and Ruffin to 360 months' imprisonment; DeJesus to 240 months; Carr to 235 months; Dorsey to 120 months; and Miller to 78 months. In addition, it ordered Maddox, Cooper, and Carr to pay a $7 million money judgment. Defendants then appealed.

## II.     GRAND JURY COMPOSITION

Maddox first seeks to have his conviction set aside and the indictment overturned on the basis that the composition of the grand jury violated his right to equal protection.  Specifically, he argues that African-Americans were systematically excluded from the grand jury that indicted him, as well as from service as grand jury foreperson.  The district court denied Maddox's motion to dismiss on these grounds.

The courts have long "recognized that a criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded."  *Rose v. Mitchell*, 443 U.S. 545, 556 (1979).  "[I]n order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs."  *Castaneda v. Partida*, 430 U.S. 482, 494 (1977).

This requires meeting a three-part test laid out in *Castaneda*.  *United States v. Ovalle*, 136 F.3d 1092, 1104 (6th Cir. 1998) (applying *Castaneda*'s equal protection analysis to a defendant's claim under the Fifth Amendment).  First, the defendant must "establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." *Castaneda*, 430 U.S. at 494. Second, "the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time." *Id.* Third, the defendant must establish that the selection procedure was susceptible to abuse or was not racially neutral.  *Id.*

"Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the [government]

to rebut that case." *Id.* at 495. If a prima facie case of discrimination has been made and not rebutted, the defendant's conviction must be set aside and the indictment quashed. *Rose*, 443 U.S. at 551.

Here, the parties do not dispute that Maddox, an African-American, has established the first *Castaneda* element. Rather, they dispute the second and third elements, which the district court—based on the magistrate judge's report and recommendation—found Maddox had failed to establish. We review Maddox's challenge de novo. *Ovalle*, 136 F.3d at 1100.

### A. Underrepresentation

As to the degree of underrepresentation of African-Americans and minorities, the record contains an affidavit by the chief deputy clerk of the Eastern District of Tennessee, as ordered by the court, that explains the jury selection process and includes reports detailing the demographic make-up of the jury pool in the district's Northeastern Division in 2005 and 2009. According to these reports—filed pursuant to 28 U.S.C. § 1863(a)—in 2005, African-Americans comprised 1.86 percent of the qualified jurors in the master jury wheel filled and 2.2 percent of the general population of voting age in the division.[1] All ethnic minorities comprised 3.5 percent of the wheel and the same percentage in the general population.[2] In 2009, the next time the wheel was filled, African-Americans comprised 1.31 percent of qualified jurors. All minorities made up 3.27 percent of the pool.

---

[1] In his briefs, Maddox bases his argument on an assumption that Africans-Americans comprise 2.9 percent of the general population. Yet, as the government notes, this figure comes from aggregate Census data that include residents ineligible for juror duty, such as children younger than eighteen years of age. According to the deputy clerk's affidavit, the 2.2 percent figure comes from population tables of U.S. citizens of eighteen years or more that are provided by the Census Bureau and are based on the 2000 Census.

[2] As the magistrate judge noted, the grand jury that indicted Maddox was impaneled in 2008 and drawn from the master jury wheel filled in 2005.

There are two ways to compare these numbers—either way, Maddox's argument is frivolous. The easiest way is to look at the simple difference between the percentage of African-Americans in the jury wheel and in the general population. This difference was less than one percent in both years. The other way to evaluate the degree of underrepresentation is to look at the ratio between the percentage of African-Americans in the jury wheel and in the general population. Here, the percentage of African-Americans in the 2005 wheel represented about 84.5 percent of the rate of African-Americans in the general population at the time. For the 2009 pool, this rate was 59.5 percent. Between the two pools, the rate averages 77 percent.

This underrepresentation is lower than rates of underrepresentation found to be substantial by the Supreme Court. *See, e.g., Castaneda*, 430 U.S. at 486–87 (Mexican-Americans comprised 39 percent of jury wheel, about half of their rate (79.1 percent) in the general population); *Sims v. Georgia*, 389 U.S. 404, 407 (1967) (African-Americans constituted 24.4 percent of taxpayer population, but only 4.7 percent of grand jury); *Whitus v. Georgia*, 385 U.S. 545, 552 (1967) (the 9.1 percent of African-Americans in the grand jury pool constituted about one third of their rate in the general population of taxpayers (27.1 percent), a disparity that "strongly points" to discrimination), *but see Turner v. Fouche*, 396 U.S. 346, 359 (1970) (the rate of African-Americans in the jury pool (37 percent) represented about 61 percent of the group's rate in the general population (60 percent), an underrepresentation that is not "so insubstantial as to warrant no corrective action by a federal court charged with the responsibility of enforcing constitutional guarantees," particularly where 171 of the 178 potential jurors dubiously excluded for lack of "intelligence" or "uprightness" were African-American). The underrepresentation is even less substantial when taking into account the relatively small size of the overall population of African-Americans in the area.

Maddox takes issue with these figures, noting that the clerk's "documentation fail[ed] to distinguish between the pools of prospective and grand and petit jurors" and "did not distinguish between those who were merely part of the jury pools and those who actually served." As to the first issue, the clerk did not distinguish between the jury pools because, according to the affidavit, prospective jurors for both petit and grand juries were drawn from the same jury wheel. As to Maddox's second point, this Court does not find the absence of this information determinative, as the Constitution protects against the systemic exclusion of identifiable groups from the jury selection process—but does not guarantee a particular make-up of an empaneled jury. *See Taylor v. Louisiana*, 419 U.S. 522, 538 (1975) ("Defendants are not entitled to a jury of any particular composition."). For the same reason, the Court is not persuaded by the affidavit of a former Assistant U.S. Attorney in the Eastern District of Tennessee, who—based on his memory alone—declared that "at most . . . a half dozen" of the approximately 1,200 grand jurors he observed from 1978 to 2007 were ethnic minorities.

### B. Susceptibility to Abuse

Even if the underrepresentation were substantial, however, Maddox has not shown evidence that the jury selection process was susceptible to abuse or was not racially neutral. As the deputy clerk's affidavit explained, the Eastern District of Tennessee summons prospective jurors at random from a jury wheel based on a list of registered voters that have been screened for their qualifications.

Rather than alleging this specific process is discriminatory, Maddox relies on *Rose v. Mitchell*, in which the Supreme Court stated that "one may assume *for purposes of this case* that the Tennessee method of selecting a grand jury foreman is susceptible of abuse." 443 U.S. at 566 (emphasis added). Maddox argues the Court "was referencing the historical racial

discrimination in the South." Not only was the state-court method of grand jury selection in *Rose* substantially different than the randomized process used by the federal court here—jurors in *Rose* were selected by jury commissioners and foremen by judges, *see Hobby v. United States*, 468 U.S. 339, 347 (1984) ("Rose must be read in light of the method used in Tennessee to select a grand jury and its foreman")—the *Rose* Court itself warned against relying on broad arguments of historical discrimination in the place of case-specific evidence in jury-selection cases. 443 U.S. at 572 n.12.

Otherwise, Maddox argues that the district court's reliance on state voter files to compile lists of potential jurors is not race-neutral because of a 5.4 percent disparity between the rate of white and African-American voter registration. However, this Court has explicitly recognized that "[v]oter registration lists are the presumptive statutory source for potential jurors" and that the Constitution does not require a supplemental source "'simply because an identifiable group votes in a proportion lower than the rest of the population.'" *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008) (citations omitted). Maddox fails to persuasively distinguish *Odeneal*.

*C. Grand Jury Foreperson*

As for Maddox's equal protection claim based on the alleged lack of grand jury forepersons of color, he again has failed to make a prima facie showing. Though the district court in the Eastern District of Tennessee does not regularly track the racial composition of its grand jury forepersons, the magistrate judge reviewed past questionnaires and found that none of the five empaneled grand juries between 2003 and 2010 had an African-American foreperson, though one did include a black deputy foreperson.

Even if this were enough to establish substantial underrepresentation, Maddox failed to argue anywhere that the selection process is susceptible to abuse or is not race-neutral. Not only

is he silent on the issue, but the record contains no specific explanation of how jury forepersons are selected by the district court. *See* Fed. R. Crim. 6(c) ("The court will appoint one juror as the foreperson and another as the deputy foreperson."). Without any allegations or evidence, we cannot simply assume impropriety by the court.

Finally, the Supreme Court has cautioned that such claims may carry little weight, given the limited role of forepersons in the federal system. "So long as the grand jury itself is properly constituted, there is no risk that the appointment of any one of its members as foreman will distort the overall composition of the array or otherwise taint the operation of the judicial process." *Hobby*, 468 U.S. at 348. As a result, Maddox's equal protection claims fail.

## III. EVIDENTIARY ISSUES

Several defendants challenge their convictions based on evidentiary issues at trial. This Court typically reviews evidentiary rulings under an abuse of discretion standard. *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002). However, if "a defendant neglects to mount an objection to evidence at trial, he is precluded from arguing on appeal that its admission was flawed unless its allowance constituted plain error." *United States v. Carney*, 387 F.3d 436, 453 (6th Cir. 2004).

### A. Dorsey: 404(b) Evidence of Prior Conviction

Dorsey challenges the district court's decision to allow evidence of his 2001 drug conviction in New York for possession of crack cocaine under Federal Rule of Evidence 404(b).

Ahead of trial, the government filed a notice that it intended to introduce evidence "in its case-in-chief, during cross examination, or rebuttal" of the 2001 conviction "to demonstrate the requisite intent and absence of mistake or accident of defendant to possess with the intent to distribute cocaine base ('crack')." Dorsey did not respond to the notice, but objected at trial to

the testimony of Sergeant Wayne Manolescu of the Utica, New York, police department regarding the conviction. The district court overruled the objection, stating simply, "[The government] gave you appropriate notice," and allowed Manolescu to testify that he stopped Dorsey on the street after another officer had witnessed a hand-to-hand drug deal involving Dorsey. Manolescu testified that he then searched and found ten baggies of crack cocaine on Dorsey, who subsequently pleaded guilty to criminal possession of a controlled substance.

As a preliminary matter, the government argues the Court should review Dorsey's claim for plain error because Dorsey failed to object until after Manolescu began to testify. A review of the transcript shows that Dorsey's counsel requested a sidebar and objected to the 404(b) evidence soon after Manolescu took the stand and immediately after he began responding to the prosecutor's question about the events on the day of the 2001 arrest. Thus, while Dorsey declined several opportunities to object to the testimony of Manolescu before the officer took the stand, Dorsey's counsel nonetheless objected to and cut off Manolescu's testimony before any evidence of the prior conviction was introduced. For this reason, we apply the usual standard.

The admissibility of evidence of other acts under Rule 404(b) is determined by a three-step process:

> The first step requires the district court to decide whether there is sufficient evidence that the other act in question actually occurred. If so, the district court must decide whether the evidence of the other act is "'probative of a material issue other than character.'" Finally, if the evidence is probative of a material issue other than character, the district court must decide whether the "probative value of the evidence is substantially outweighed by its potential prejudicial effect."

*Haywood*, 280 F.3d at 719–720 (citations omitted). Dorsey has conceded step one—that he was convicted in 2001 for possession of crack cocaine.

1.      *Probative Value.*  As to the second step, "[e]vidence of other acts is probative of a material issue other than character if (1) the evidence is offered for an admissible purpose, (2) the purpose for which the evidence is offered is material or 'in issue,' and (3) the evidence is probative with regard to the purpose for which it is offered."  *Id.* at 720 (citing *United States v. Johnson*, 27 F.3d 1186, 1190–91 (6th Cir. 1994)).  Here, the government stated in its notice that it sought to introduce Dorsey's 2001 conviction to show "intent and absence of mistake."[3]  This Court has recognized intent is an admissible purpose for 404(b) evidence and is "in issue" when a defendant is charged with a specific intent crime, such as Dorsey's possession with the intent to distribute charge.  *See id.* at 721.

Whether the 2001 conviction was probative of this purpose is another matter.  "To determine if evidence of other acts is probative of intent, we look to whether the evidence relates to conduct that is 'substantially similar and reasonably near in time' to the specific intent offense at issue."  *Id.* (citing *United States v. Blankenship*, 775 F.2d 735, 739 (6th Cir. 1985)).  In addressing whether a possession conviction was probative of intent on a distribution charge, the court in *Haywood* noted that this "analysis turns on whether [the defendant] intended to distribute" the drugs in the prior possession conviction.  *Id.*

Dorsey argues that the eight-year-old possession conviction in New York is insufficiently similar and too remote in time to be probative to establish intent for possession with the intent to distribute.  The government argues that Dorsey's possession conviction demonstrated his intent to distribute because Dorsey was arrested in 2001 when carrying drugs in individually packaged baggies, and the conviction came only two years before the start of the conspiracy charged here.

---

[3] As for "absence of mistake," as Dorsey persuasively argues, it was never at issue in this case because Dorsey's defense was that he did not possess the drugs discovered by law enforcement officers.

According to Dorsey's presentencing report and an information filed by the government, Dorsey's 2001 conviction was for *criminal* possession of a controlled substance in the fifth degree. Under New York law, "[a] person is guilty of criminal possession of a controlled substance in the fifth degree" either if he possesses "a controlled substance with intent to sell it" *or* if he simply possesses specific drugs in certain quantities, such as half an ounce of a "narcotic preparation" or 500 milligrams of cocaine. N.Y. Penal Law § 220.06(1)–(7) (McKinney 2001). Unfortunately, the district court did not hold a hearing to review the conduct underlying Dorsey's prior conviction, such that the basis of the conviction is clear, and the details that emerged at trial are sketchy at best. For instance, Manolescu's testimony did not make clear whether Dorsey bought or sold drugs in the 2001 transaction.

Based on the facts in the record, the only similarity between the prior offense and the charged offenses appears to be the hand-to-hand nature of the drug deal that led to the possession conviction. Manolescu testified that he arrested Dorsey on the street after another officer witnessed a hand-to-hand drug transaction that involved Dorsey. Similarly, Rush testified that Dorsey's role when he came to Tennessee in 2006 was in part to "learn the town and distribute" with "a couple hand to hand" powder cocaine sales that Rush witnessed. However, by Dorsey's second trip to Tennessee in 2009, his role appeared to have changed to operating a stash house for Maddox and not conducting sales, according to Rush.

The government has shown no further evidence of similarity. Most notably, nothing in the charge or the circumstances described by Manolescu tied Dorsey's drug deal to a larger conspiracy of the sort at issue here, much less to Maddox's operations in New York or Tennessee. *See United States v. Bell*, 516 F.3d 432, 444 (6th Cir. 2008).

In addition, the timing is not as tight as the government claims. The 2001 sale occurred five years before Dorsey first came to Tennessee to sell drugs, according to Rush, and eight years before the arrest leading to the possession with intent to distribute charges in this case. *See United States v. Freeman*, 412 F. App'x 735, 745 (6th Cir. 2010) (noting that, while "[t]here is no absolute maximum number of years that may separate a prior act and the offense charged," a ten-year-old conviction was not sufficiently similar or reasonably close in time to be probative of intent for a subsequent charge, though both dealt with the sale of crack-cocaine in Tennessee). The government argues the conviction came only two years before the start of the overall conspiracy in which Dorsey played a part. But this ignores that the government presented no evidence tying Dorsey to the conspiracy before 2006 or, again, tying the 2001 offense to a larger conspiracy. As this Court stated in *Bell*, "[t]he only way to reach the conclusion that the person currently has the intent to possess and distribute based solely on evidence of *unrelated* prior convictions for drug distribution is by employing the very kind of reasoning—*i.e.*, once a drug dealer, always a drug dealer—which 404(b) excludes." *Bell*, 516 F.3d at 444.

Given the long period of time and the lack of evidence establishing a similarity between the prior conviction and the conduct for which Dorsey was charged here, it was an error for the district court to implicitly find the 404(b) evidence was probative of Dorsey's intent.

2.      *Prejudicial Effect.* Even if it were probative, the evidence of the 2001 conviction was inadmissible because its value was substantially outweighed by its potential prejudicial effect. *Haywood*, 280 F.3d at 723. The district court decision in this balancing process is generally "afforded great deference," and the evidence is viewed in the light most favorable to its proponent. *Bell*, 516 F.3d at 445.

We have noted that when weighing the probative value of prior convictions or other acts evidence, a court "should consider the government's alternative sources of proving intent," *Bell*, 516 F.3d at 445, to determine if the 404(b) evidence was unnecessary, *Haywood*, 280 F.3d at 723. In our opinion, the evidence of Dorsey's past conviction was of little value to the jury in establishing Dorsey's intent to distribute the cocaine in Ebberts' car trunk, in light of the government's witness testimony, *see United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996), and the substantial quantity of drugs found in the trunk, *Bell*, 516 F.3d at 446. Given that Rush testified about Dorsey's 2006 drug sales and his role in 2009, the prior conviction evidence was unnecessary.

On the flip side, it was highly prejudicial. We have repeatedly stated that prior crimes evidence "unquestionably has a powerful and prejudicial impact" on a jury. *Bell*, 516 F.3d at 446 (citing *Johnson*, 27 F.3d at 1193). This is particularly true when the evidence risks leading the jury to punish the defendant for being a "bad guy," rather than for his involvement in the offense at issue. *Id.*

The government argues that any prejudicial impact was mitigated by the district court's limiting instruction, in which the court told the jury it could "consider the evidence only as it relates to the Government's claim on . . . the Defendant's knowledge and intent. You should not consider it for any other purpose." While this Court has noted that a limiting instruction may significantly mitigate prejudice in admitting 404(b) evidence, we have also recognized that limiting instructions directing the jury to regard evidence for intent when the evidence is not probative of intent does nothing to abate the evidence's prejudicial impact. *See Bell*, 516 F.3d at 446–47; *Haywood*, 280 F.3d at 724.

*3. Harmless Error.* However, even if the district court abused its discretion in allowing the prior conviction into evidence, Dorsey is not entitled to a new trial if the error was harmless. "An error is harmless unless one can say, with fair assurance that the error materially affected the defendant's substantial rights—that the judgment was substantially swayed by the error." *United States v. Murphy*, 241 F.3d 447, 453 (6th Cir. 2001) (citations omitted). This "generally depends on whether the properly admissible evidence of the defendant's guilt was overwhelming." *Haywood*, 280 F.3d at 724.

The government's evidence against Dorsey—as described in detail in the next section— met this standard. Dorsey was arrested at Maddox's house, soon after Ebberts parked her car outside the house with the 1.5 kilograms of cocaine that Rush and Maddox purchased still in the trunk. Rush established that Dorsey served as a drug dealer for Maddox and essentially as a guard, with Miller, of the cocaine. Both Rush and Ebberts testified that Dorsey spoke with either Maddox or Rush after they were pulled over by police; according to Rush, Dorsey told Maddox that police had descended on Maddox's home, and Maddox instructed Dorsey not to let them in. In addition, police officers testified that they witnessed Dorsey keeping watch on the street in the lead-up to Ebberts' arrival and that they intercepted a text message sent by Maddox to flush the keys to Ebberts' car. This evidence was also largely uncontested. While the defendants on the whole attempted to undermine Rush's general credibility as a witness, and there was some inconsistency as to who spoke to whom after Maddox and Rush were pulled over, the jury resolved these matters and returned a guilty verdict. As a result, we cannot say that the jury was substantially swayed by Dorsey's inadmissible conviction, rather than the weight of other evidence against him.

### B. *Ruffin: Admission of Incriminating Statements*

Ruffin argues that the district court erred in partially denying his motion to suppress incriminating statements Ruffin made to DEA agent Brian Vicchio after Ruffin's arrest.

Vicchio arrested Ruffin after he and other officers observed Ruffin driving his car in Johnson City, Tennessee. Vicchio mirandized Ruffin while placing him into a squad car, and Ruffin made incriminating statements while in the car. Vicchio then drove Ruffin to a DEA field office in Johnson City, where Ruffin was again mirandized and made more incriminating statements.

After holding a suppression hearing, the magistrate judge recommended suppression of Ruffin's statements made at the scene of the arrest, finding Vicchio's *Miranda* warning—which was videotaped—insufficient because it did not make clear Ruffin had the right to a lawyer *before* undergoing questioning. However, the magistrate judge recommended denying the motion as to Ruffin's statements made at the DEA field office. The second *Miranda* warning was not recorded, but the magistrate judge noted that Vicchio had testified that he re-mirandized Ruffin at the field office before initiating the interrogation, and that he specifically included Ruffin's right to consult with an attorney before questioning began. The magistrate judge found Vicchio's testimony credible and uncontroverted, as Ruffin had declined to testify.

The magistrate judge also rejected Ruffin's argument that he was intoxicated on cocaine at the time of his arrest and unable to make a knowing and voluntary waiver of his rights. The video of his arrest showed that he told Vicchio, "I'm telling you man, I'm fucked up, man." The magistrate judge determined the statement referred to Ruffin's "legal problems" and not his mental state. Finding that "there is absolutely no evidence before this court to suggest that the defendant abused cocaine or any other drug at any particular time before his arrest, much less

[was] intoxicated on some drug," the magistrate judge concluded that Ruffin was properly mirandized at the field office and had made a knowing and voluntary waiver of his rights.

The district court adopted the magistrate judge's recommendation without further findings of fact, save for a finding that review of the arrest video did not indicate any coercion by officers.

On appeal, Ruffin argues that the district court should have excluded the second set of incriminating statements because (1) the statements were impermissible fruits of the earlier, improper *Miranda* warnings; and (2) the district court erred in finding that Ruffin's waiver was voluntary. As with the other evidentiary issues before us, we review findings of fact for clear error and conclusions of law de novo. *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008). "We review the evidence 'in the light most likely to support the district court's decision.'" *Id.* (citation omitted).

1. *Miranda.* As to the *Miranda* issue, Ruffin argues the second set of incriminating statements should have been suppressed under *Missouri v. Seibert*, 542 U.S. 600 (2004), because the "[a]rresting officers subjected Mr. Ruffin to a question-first, warn-later interrogation." Ruffin does not challenge the district court's conclusion that Vicchio properly mirandized Ruffin before questioning him at the office. Rather, he argues that this "second round of questioning was merely a continuation of the first round, with the same officers asking the same or similar questions approximately thirty minutes later." Thus, he argues, the district court should have excluded the second set of statements, as well.

In *Seibert*, the Supreme Court held that a defendant's confession was inadmissible, even though it came after a *Miranda* warning, because the police had interrogated the defendant without a proper warning first in order to elicit the same confession. 542 U.S. at 604–06

(plurality opinion). In assessing the effectiveness of a *Miranda* warning delivered "midstream" between rounds of questioning, a plurality of the Court looked to several "relevant facts":

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615. The Justices determined "[i]t would have been reasonable to regard the two sessions as parts of a continuum," given that the first, unwarned interrogation was "exhaustive" and both interrogations were conducted in the same location by the same officers asking the same questions and were separated only by a 15- to 20-minute break. *Id.* at 616–17.

By contrast, in *Bobby v. Dixon*, the Court held that a properly mirandized confession—following an unwarned and inadmissible confession—may be admissible, if there was no "'nexus'" between the two sets of statements and if the circumstances of the interrogation had changed. 132 S. Ct. 26, 31–32 (2011) (per curiam). There, the Court found the defendant's confession to forging a murder victim's signature sufficiently distinct from his subsequent confession to murdering the victim. It also noted that a four-hour break in the questioning—during which time the defendant traveled to jail and claimed to have spoken with his lawyer—sufficiently changed the circumstances of the interrogations. *Id.*

Here, Ruffin's situation bears little resemblance to *Seibert*. Though the same officer, Vicchio, conducted all of the questioning, the focus of Vicchio's questions at the arrest scene did not relate to the substance of the charges in the case. At the arrest scene, Vicchio focused on explaining Ruffin's situation to him, asking if there were any drugs in the car Ruffin drove, and asking if Ruffin would agree to speak with agents at their office.

During this conversation, Ruffin asked Vicchio what the officers wanted to talk about, and Vicchio responded that he wanted Ruffin "to tell [him] anything and everything [Ruffin] know[s] about the distribution of cocaine and crack cocaine." Ruffin argues that this statement overlaps with the office interrogation, which elicited statements about the drug conspiracy, such that both sets of questions should be treated as one continuous interrogation under *Seibert*. This is a distortion of what happened. The video makes clear that Vicchio's statement was an explanation, not part of a line of questioning. Ruffin did not respond to it, and Vicchio did not press for a response. In fact, Vicchio repeatedly explained in the car that he wanted to interrogate Ruffin at the office and not at the scene of the arrest. As Vicchio explained at the suppression hearing, he had no intention of interrogating Ruffin on the side of the road, where Ruffin could be spotted as a snitch.

In addition, review of the video of his arrest makes clear that the DEA agents did not engage in a deliberate "question-first, warn-later" strategy, even if they did intentionally question him before he was appointed counsel the following day. *See Seibert*, 542 U.S. at 618–22 (Kennedy, J. concurring) (focusing on the officer's intent). When placing Ruffin in the patrol car, Vicchio attempted a full *Miranda* warning and properly warned Ruffin of his right to remain silent and to an attorney. Though Vicchio failed to warn Ruffin that his right to an attorney included a right to speak with the attorney *before* any interrogation occurred, there is no concrete evidence this omission was intentional.

Ruffin nonetheless argues that testimony by DEA agent Kevin Kimbrough, who was present at the arrest and observed the office interrogation, shows Vicchio deliberately attempted to circumvent *Miranda* with this defective warning. Kimbrough testified at the suppression hearing that "[the officers] usually seize the opportunity to interview someone prior to [the

arrestee] being appointed counsel" and that they did so with Ruffin. Ruffin treats this statement as a circumstantial admission of an improper intent, given Vicchio failed to expressly include this right in the initial *Miranda* warning. However, it's important to note what Kimbrough did not state. He did not testify that officers knowingly question improperly mirandized arrestees or that they deliberately do not mirandize arrestees in order to question them without counsel—or even that they pressure mirandized arrestees to speak with officers outside the presence of counsel. Rather, he testified that officers "seize" the chance to do so if they can. Kimbrough immediately followed his statement with an explanation that he believed Vicchio *had* mirandized Ruffin before the interrogation, and that, given Ruffin was "extremely forthcoming," Kimbrough sensed Ruffin would talk to officers that night and again in the future. Without more, Kimbrough's statement does not show that Vicchio intentionally delivered an incomplete set of warnings at the scene of the arrest in order to interrogate Ruffin later outside the presence of counsel.

As such, the district court did not err in treating the arrest scene questioning as separate from the field office interrogation, and in admitting Ruffin's statements made after Vicchio gave him the second and proper set of *Miranda* warnings.

*2.    Waiver.* Ruffin also makes two arguments related to waiver: (1) that the district court erred in finding no persuasive evidence that Ruffin was intoxicated, and (2) that it improperly placed the burden on Ruffin to show the waiver was not knowing, intelligent, and voluntary.

A defendant's "statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382

(2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). The waiver of the right to remain silent can be express or implied, based on the words and actions of the person interrogated. *Id.* at 383–84, 387. To establish an implied waiver, the prosecution must show (1) that a *Miranda* warning was given, (2) that it was understood by the accused, and (3) that the subsequent statement was uncoerced. *Id.* at 384.

As to Ruffin's argument that the district court improperly placed this "heavy burden" to show a valid waiver on him, he overreaches. The magistrate judge—whose reasoning and conclusions were adopted by the district court—addressed and explicitly examined the required burden on the government before determining that it had met its burden through Vicchio's uncontradicted testimony. While the magistrate judge's explicit findings of fact were somewhat sparse, Vicchio testified at the suppression hearing that (1) he properly mirandized Ruffin, (2) he repeatedly asked if Ruffin would agree to answer questions without an attorney present, and (3) Ruffin agreed to talk. Asked about Ruffin's demeanor, he testified that Ruffin was "humble," "relaxed," and "laughed throughout the interview." Kimbrough largely substantiated Vicchio's account and also testified that Ruffin "was extremely forthcoming." In addition, the district court reviewed the videotaped arrest and concluded that no evidence of police coercion existed. Together, this evidence was sufficient for the government to meet its burden in establishing that Ruffin waived his right to remain silent.

As to Ruffin's argument that the district court clearly erred in finding that no "persuasive evidence of intoxication" existed, we cannot agree. The magistrate judge heard and viewed credibly the testimony of two seasoned DEA agents who both testified that Ruffin did not appear to be under the influence of narcotics and was forthright during the interrogation. *See Anderson v. City of Bessemer,* 470 U.S. 564, 575 (1985) ("[W]hen a trial judge's finding is based on his

decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.").

The magistrate judge also interpreted Ruffin's videotaped statement at the scene of the arrest that he was "fucked up" to refer to Ruffin's "legal problems" and not his mental condition.[4] This Court may not have come to the same conclusion about the meaning of Ruffin's ambiguous statement, but that does not make the magistrate judge's otherwise reasonable interpretation clear error. *See id.* at 574–76 (citations omitted) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

As to the positive drug screen result, while this Court is troubled by the potential after-the-fact revelation of evidence relevant to the suppression issue, we cannot hold that the district court's findings were clearly erroneous. To do so on the facts before us would require too much conjecture. Ruffin has highlighted a section of his presentencing report, which states that he submitted to a drug screen on the night of the arrest and the results "were presumptively positive for cocaine." But nothing in the record or briefs explains what a "presumptively positive" result means, much less how it compares with the cocaine intoxication level required to render a defendant incapable of waiving his *Miranda* rights. Ruffin also insinuates that the government's failure to disclose the drug test may violate the principles underlying *Brady*. However, we do not know when Ruffin or the government learned of the test result. At this stage, the

---

[4] The magistrate judge claimed this interpretation matched Vicchio's testimony. However, the hearing transcript—not available at the time the report and recommendation and district court order were issued—shows that Vicchio testified that he believed the statement referred to the amount of drugs Ruffin "had at the time." Specifically, Vicchio testified that it meant that Ruffin "[did]n't have anything at that point in time."

unexplained test result alone does not rise to the level of extrinsic evidence that undermines the credibility of Vicchio's and Kimbrough's testimony.

Finally, even if Ruffin had shown some evidence of intoxication, his claim fails because he cannot point to any evidence that Vicchio or Kimbrough used coercion to elicit the incriminating statements. *United States v. Dunn*, 269 F. App'x 567, 572 (6th Cir. 2008) (citations omitted) (noting that "[a]bsent coercion," this Court has "held that a waiver was voluntary even where the defendant was under the influence of 'an intoxicating medication'" or had been "drinking heavily."). Again, the district court reviewed videotape evidence of the arrest and found no evidence of coercion, a finding Ruffin does nothing to rebut or challenge on appeal.

### C. Carr: Admission of Incomplete Recording

Carr argues the trial court erred in admitting the partial audio recording of a conversation between him and a confidential informant that the informant secretly recorded on August 11, 2008.

To begin, Carr first argues that the court abused its discretion because "the entire tape" played at trial was inaudible. The admission of audio "recordings at trial rests within the sound discretion of the trial court." *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983) (citation omitted). To be admissible, recordings must "be authentic, accurate and trustworthy," as well as "audible and sufficiently comprehensible for the jury to consider the contents." *Id.* A recording is "inadmissible if the 'unintelligible portions are so substantial as to render the recording as a whole untrustworthy.'" *Id.* (citations omitted).

In arguing that the recording at trial was sufficiently inaudible to be inadmissible, Carr relies solely on a notation in the trial transcript by the court reporter: "Playing of audio tape

inaudible. Record reflects conversation from provided transcript." This alone is insufficient to establish that the trial court abused its discretion. This Court declines to treat a court reporter's transcription notes either as evidence or as an implied finding of fact by the trial court, as Carr appears to ask us to do. The district court made no findings on the matter of audibility, and Carr never objected, before or at trial, that the recording was inaudible. In fact, Carr's counsel stated at trial that he preferred the entire recording enter into evidence, which suggests he initially believed it was audible. And, as the government notes, the court reporter often used this notation when audio recordings were played at trial—recordings that witness testimony makes clear were audible. Here, for instance, the witness testifying at the time testified that he recognized the voices in the recording as his and Carr's, and answered specific questions about statements made in the recording.

Next, Carr argues that the trial court violated Federal Rule of Evidence 106 because it did not listen to the entire recording to determine the relevance of the omitted portions. This claim also has no merit.

Rule 106 provides that, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.." Fed. R. Evid. 106 (2010) (amended 2011). This Court has determined that "Rule 106 is intended to eliminate the misleading impression created by taking a statement out of context," but "is not designed to make something admissible that should be excluded." *United States v. Costner*, 684 F.2d 370, 373 (6th Cir. 1982). "In ruling on a Rule 106 request to supplement a statement, the district court must determine '(1) whether the additional evidence explains the evidence already admitted; (2) whether it places the admitted

evidence in its proper context; (3) whether its admission will serve to avoid misleading the trier of fact; and (4) whether its admission will insure a fair and impartial understanding of all of the evidence.'" *United States v. McAllister*, 693 F.3d 572, 584 (6th Cir. 2012) (citing *United States v. Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996)).

At trial, Carr objected to the government playing only a portion of the recording during the direct examination of a witness.[5] The government—which had prepared a transcript of the excerpt only—explained to the court that the omitted part of the recording contained a conversation between the testifying witness and a third party that did not relate to the drug transaction relevant to the trial. However, it did not object to Carr introducing the entire recording on cross examination. Stating that introducing irrelevant evidence would "waste the time of the jury," the court overruled Carr's objection.

There are two problems with Carr's argument on appeal. First, according to Carr, the district court had a formal "obligation" under *Costner*, 684 F.2d 370, to independently review the entirety of the recording and "make a determination which would allow it to excise only irrelevant portions." However, the court in *Costner* discussed this specific "obligation" to review the evidence in the context of Federal Rule of Evidence 612, which relates to the admission of a writing used to refresh a witness's memory. 684 F.2d at 373. This distinction matters because Rule 612 explicitly requires a district court to examine the writing in camera and to remove irrelevant portions before allowing the writing into evidence. Rule 106 does not contain the same requirement.

Second, Carr has failed to controvert the trial court's finding that the omitted portions of the recording were irrelevant. Carr has not presented evidence of these portions' contents, much

---

[5] Carr's counsel expressly stated that he did not object to the recording, but requested the government play the entire recording. The district court treated this as an objection.

less argued that he was prejudiced in any way by their omission from the evidence. Thus, this Court cannot hold that the trial court abused its discretion in admitting only part of the August 11, 2008, recording.

## IV. INSUFFICIENCY OF EVIDENCE

Four defendants—Carr, Dorsey, DeJesus, and Cooper—argue that the evidence presented at trial was not sufficient to support their convictions. This Court reviews an insufficiency of the evidence claim by considering "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "We reverse a conviction for insufficiency of the evidence only if it is not supported by substantial and competent evidence, whether direct or wholly circumstantial, upon the record as a whole." *United States v. LaPointe*, 690 F.3d 434, 443 (6th Cir. 2012).

### A. Legal Standards

"To sustain a conviction for drug conspiracy under [21 U.S.C. § 846], the government must prove beyond a reasonable doubt: (1) an agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007) (citations omitted). "[P]roof of a formal agreement is not necessary"; a conspiracy may be inferred from evidence that "can reasonably be interpreted as participation in the common plan," *United States v. Avery*, 128 F.3d 966, 970–71 (6th Cir. 1997) (citations omitted).

As to the substantive charges underlying the conspiracy, to prove possession with intent to distribute illegal drugs, the government must show "(1) the defendant knowingly; (2) possessed a controlled substance; (3) with intent to distribute." *United States v. Jackson,*

55 F.3d 1219, 1225 (6th Cir. 1995) (citation omitted). In order to establish the crime of distribution of controlled substances, the government must prove that the defendant: (1) knowingly or intentionally distributed the substance, and; (2) at the time of such distribution knew what the substance was. *United States v. Colon*, 268 F.3d 367, 376 (6th Cir. 2001). Finally, to show aiding and abetting requires proof of "(1) an act by a defendant which contributes to the execution of a crime; and (2) the intent to aid in its commission." *United States v. Lowery*, 60 F.3d 1199, 1202 (6th Cir. 1995) (citation omitted).

### B. Carr

Though Carr was convicted of multiple offenses, on appeal he challenges only his conviction for conspiracy to distribute and to possess with the intent to distribute at least five kilograms of cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A).

Carr argues that the evidence at trial showed his actions were limited to individual sales of small, "'street-level' quantities of cocaine to end-users," and thus was insufficient to support a conviction for the distribution of five kilograms or more, even if there was evidence of such a conspiracy between Maddox, Rush, and others.[6] While this Court would agree with Carr that the evidence might not support his conviction if limited to these individual sales, *see United States v. Pruitt*, 156 F.3d 638, 644 (6th Cir. 1998), the government produced substantial evidence of Carr's involvement in larger-scale cocaine distribution.

For instance, Rush testified that Carr's role evolved from small sales to cooking cocaine and "helping Maddox find connections to purchase . . . more kilos . . . for a better price, and then

---

[6] None of the defendants challenging the sufficiency of evidence for their convictions denies the government presented sufficient evidence of a drug-trafficking conspiracy centered around Maddox that dealt with more than five kilograms of cocaine. McGirt, for instance, testified that he purchased 21 to 22 kilograms of cocaine from Maddox in 2006 and 2007, while Rush testified that he cooked at least 40 kilograms of cocaine into crack cocaine for Maddox during the course of the conspiracy.

from there, he moved out and was doing his own thing, but still getting the drugs from Maddox."

According to Rush, Carr had a source in Florida from whom he would buy up to a kilogram of cocaine at a time, and he, Maddox, and Rush once went to Florida together and purchased a kilogram of cocaine from the source.

Another witness, Kim Campbell, testified that she served as a courier for Maddox, Rush, and Carr, who generally paid her in crack cocaine in exchange for renting cars and driving to other states (New York, Georgia, and Florida) to deliver and pick up unspecified goods for them. She testified that in 2006 or 2007, she accompanied Carr to Florida; though she went home by herself and did not witness any illegal activity, she testified that Carr became "hysterical" at their hotel searching for wads of rolled up money that he had hidden in multiple pockets of his pants.

The government also presented a series of recorded phone calls between Carr and Maddox relating to cocaine and money, including a call in which Carr told Maddox he was going to the "bottom bottom" and the "O"—which Vicchio interpreted as meaning Carr was going to Miami and Orlando, Florida, where his cocaine sources were located.

In addition, Campbell and several other witnesses testified that they regularly purchased cocaine from Carr, and the government introduced audio recordings by Joe Chapman—a co-defendant and informant—making two controlled drug purchases from Carr.

During one of these transactions between Chapman and Carr in August 2008, Chapman mentioned knowing a possible new customer, and Carr gave prices for ounces of cocaine and crack cocaine. In another recorded interaction in September 2008, Carr met with Chapman and an informant. He asked the informant for "big work" because he had recently lost $15,000 on a bad-quality cocaine purchase from Atlanta with his "cousin" that would not cook properly into crack cocaine. Chapman testified that Carr said he was looking for a big investment, and when

the informant quoted a price of $27,000 for a kilogram of cocaine, Carr responded that in Florida the price was $25,000. Carr nonetheless told the informant that "as long as you keep feeding me[,] we gonna eat man," which Chapman explained meant Carr would continue to buy cocaine from the informant.

Carr argues this last conversation "goes against the idea that he was participating in a conspiracy with the codefendants," as Carr's individual purchase "would have been directly adverse to the interests" of the conspiracy. This is a leap. Not only did Carr state in the recording that he had purchased kilograms of cocaine in Atlanta with his cousin—Maddox—his purchase from the informant would not conflict with Rush's testimony that Carr's role had evolved from small sales to both supplying cocaine for and buying from Maddox. Viewed in the prosecution's favor, this evidence more than sufficiently established Carr's knowledge of and participation as a member of the conspiracy to distribute cocaine.

### *C. DeJesus*

DeJesus was convicted on two counts of conspiracy to distribute and to possess with the intent to distribute: (1) 500 grams or more of cocaine (a lesser included offense of Count 1), and (2) fifty grams or more of cocaine base (Count 5). On appeal, he argues that the government failed to present sufficient evidence to support either conviction.

The government produced a combination of witness testimony and intercepted phone calls and text messages between Maddox and DeJesus that established DeJesus's role in the drug conspiracies. Rush testified that DeJesus was a friend of Maddox's from Utica, New York, who stayed at Maddox's house in Johnson City, Tennessee, "for a while" in 2003 or 2004 to sell marijuana. According to Rush, DeJesus had a source for cocaine in New York City, and

Maddox once said that he was going with DeJesus to meet the source to get better prices and better product.

Rush also interpreted a number of intercepted phone calls and text messages between DeJesus and Maddox that showed DeJesus entered into agreements to sell cocaine to Maddox and helped him cook it into crack cocaine. In one text message, Maddox explained he wanted to buy an ounce of cocaine for $1,200, according to Rush. DeJesus then warned Maddox "I talked to o and he said u gonna lose when you go swimming." Rush explained "swimming" to be a euphemism for cooking cocaine into crack cocaine, and "losing" to mean losing product in the cooking process. Not surprisingly, Maddox responded, "I don't wanna go swimming."

In a subsequent series of messages decoded by Rush, DeJesus offered to pay $500 toward an ounce of cocaine that Maddox agreed to purchase. A series of phone calls and text messages two weeks later established that DeJesus had sold cocaine to Maddox, who tried unsuccessfully to cook it into crack cocaine and sought advice from DeJesus. Maddox explained over the phone that he had "overwet" the drugs, which Rush explained meant he used too much baking soda to cook the cocaine, and DeJesus advised Maddox to try putting the drugs in the freezer or oven to harden. After several more rounds of text messages, DeJesus asked Maddox to bring him the product, but Maddox responded that he was able to produce only 3.5 grams of crack cocaine.

Rush interpreted numerous other messages and calls between Maddox and DeJesus in which DeJesus asked for a half ounce ("half a man") of cocaine and spoke of flipping drugs for a quick profit; and in which Maddox wrote that he was selling marijuana ("I got some dro on the market"; "50s of dro on market") and said it was a "hard market" for cocaine.

The thrust of DeJesus's argument is that he was insufficiently linked to the bulk of the conspiracy's activities, which occurred primarily in Tennessee, such that he was not aware of the

conspiracy and did not participate in it. Even if DeJesus did not take part in purchasing cocaine in Georgia and Florida, for instance, the jury could infer he knew of the conspiracy from his presence in Tennessee in 2003 or 2004 and from his continued contact and drug deals with Maddox. That DeJesus subsequently connected Maddox with New York suppliers, and supplied cocaine and helped Maddox cook it into crack cocaine himself, shows DeJesus participated in the conspiracy, as well. As a result, his convictions were supported by sufficient evidence.

### D. Cooper

Cooper was convicted of five conspiracies: (1) to distribute and to possess with intent to distribute cocaine; (2) to distribute and to possess with intent to distribute cocaine base; (3) to distribute and to possess with intent to distribute marijuana; (4) to commit money laundering; and (5) to commit witness intimidation. He challenges the sufficiency of the evidence on all the convictions.

*1.      Cocaine & Crack Cocaine Conspiracies.* Cooper argues that the government did not produce evidence that he knew of or intended to join the conspiracy relating to cocaine and crack cocaine. However, at trial, the government produced a range of evidence implicating Cooper. The bulk of the government's evidence came from two jailhouse informants: Trewayne Sanders and Daniel Ballinger. Sanders testified that he witnessed Cooper sell powder cocaine to Sanders's father on several occasions in New York. Ballinger testified that, while in jail together, Cooper told him that Cooper "was buying kilos of crack, of powder cocaine from a Mexican, and he was coming from Utica, New York to Tennessee to sell drugs." Ballinger testified that Cooper said he would buy kilos of pure cocaine for $27,000 and sell "ounces [of crack cocaine] for a thousand dollars apiece to individuals." According to Ballinger, Cooper said

he had multiple associates and people working for him, and that he operated "trap houses" from which he sold crack cocaine.

In addition, the government introduced an intercepted text message exchange between Cooper and Maddox that, according to Vicchio's testimony, discussed $1,100 worth of cocaine. There was also a recorded phone conversation between the two men about an unknown drug, during which Cooper indicated to Maddox that he had enough supply at the time.

Cooper argues that Ballinger's and Sanders's testimony should be discredited because of their status as jailhouse informants and because their testimony conflicts with that of other witnesses. In particular Cooper notes that, while Ballinger testified to Cooper's high position within the conspiracy, Rush—the key witness in the government's case—testified extensively about Maddox's operations during three days of testimony and never once mentioned Cooper.

While this discrepancy gives this Court pause, credibility determinations are within the sole province of the jury, and this Court grants special deference to the resolution of credibility questions by the jury. *United States v. Latouf*, 132 F.3d 320, 330–31 (6th Cir. 1997). We have stated that "[w]itness incredibility might render evidence insufficient as a matter of law only in the most extreme cases, where it is 'so inherently incredible, so contrary to the teachings of basic human experience, so completely at odds with ordinary common sense, that no reasonable person would believe it beyond a reasonable doubt.'" *United States v. Morrison*, 125 F.3d 856 (table opinion), 1997 WL 636623, at *3 (6th Cir. 1997) (quotation omitted). Here, neither witness said anything so wildly untrustworthy that no reasonable person would believe it—their testimony squared with the overall scope of the conspiracy. In addition, Cooper had the opportunity to cross examine the witnesses about any lenient treatment they received in

exchange for their testimony and to present witnesses to undermine their testimony—which he did.

Cooper also argues that no evidence relating to the cocaine conspiracy connects him directly to Tennessee, as the hand-to-hand drug sales Sanders testified to took place in New York. However, this ignores that witness testimony and intercepted communications established that the drug-trafficking conspiracy branched from Tennessee to New York, Georgia, and Florida, with suppliers and activity in each of these states, as well.

2.      *Marijuana Conspiracy.*  As to the marijuana conviction, Cooper concedes that the government presented evidence of the charged marijuana conspiracy, but argues that it failed to present sufficient evidence to link him to the conspiracy.  Again, we disagree.

Both Rush and Maddox testified that Maddox had trafficked marijuana.  Maddox testified that he was exclusively a marijuana dealer—not a cocaine dealer—and sold high-quality marijuana in Tennessee that he purchased from Atlanta, Georgia, throughout the period of the charged conspiracy.  By contrast, Rush testified that Maddox sold marijuana temporarily around August 2008, after purchasing a kilogram of fake cocaine that he could not cook into crack cocaine or sell.  According to Rush, Maddox began to sell $50 bags of hydroponic marijuana at the time as a means of staying in business.  In addition, the government introduced a drug ledger seized by police that, according to various agents and Rush, detailed the sale of marijuana by the pound and was written in Carr's handwriting.

As for evidence connecting Cooper to the marijuana conspiracy, the government introduced a series of text messages between Cooper and Maddox.  While the government characterizes these as "many [communications] involv[ing] the trafficking of high-quality

marijuana," only two sets of messages were explicitly discussed at trial. The first, dated from September 6, 2008, was as follows:

> Maddox: I dont even know but my dude got AZ …
> Cooper: Wat he talken qt
> Maddox: 390 cuz its 1550 for da whole thing…

Vicchio testified that "AZ" referred to marijuana and "qt" to a quarter ounce, such that he believed Maddox was explaining to Cooper that a price for a quarter ounce of high-quality marijuana was $390 and the ounce price was $1,550.

> The second exchange took place on September 12, 2008:

> Maddox: U got a line on some az?
> Maddox: u got a line?
> Maddox: What He talkin bout?
> Cooper: Three fifty
> Maddox: 2ps?
> Cooper: for three of them

Vicchio testified that Maddox appeared to be looking for marijuana, though Vicchio did not recall the meaning of "ps."

On appeal, Cooper argues that these text messages are insufficient to connect him to the conspiracy because the amount of marijuana discussed—a quarter ounce—is consistent with his admitted personal use; the messages, he argues, are evidence that he and Maddox sought to find marijuana to smoke together.

While this Court is sympathetic to Cooper's argument in the abstract, based on the circumstances of the text messages here, a jury could have concluded that Cooper and Maddox were discussing an amount of marijuana they intended to sell. The messages corresponded to a time period when, according to Rush, Maddox was selling marijuana in $50 bags—amounts well below the $390 amount at issue in the texts.

3. *Money Laundering.* Section 1956(a)(1)(A)(i) provides for criminal penalties against any person who, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i). To prove a defendant guilty of promotional money laundering, the government must prove that he "(1) conducted a financial transaction that involved the proceeds of unlawful activity; (2) knew the property involved was proceeds of unlawful activity; and (3) intended to promote that unlawful activity." *United States v. Haun*, 90 F.3d 1096, 1100 (6th Cir. 1996), *overruled in part on other grounds by United States v. Crosgrove*, 637 F.3d 646, 654 (6th Cir. 2011). "The paradigmatic example of this crime is a drug dealer using the proceeds of a drug transaction to purchase additional drugs and consummate future sales." *United States v. Warshak*, 631 F.3d 266, 317 (6th Cir. 2010) (citation omitted).

Multiple witnesses testified to the existence of the money-laundering scheme. Rush testified that he and Maddox wired money from the sale of drugs through Western Union to other co-conspirators and to Maddox's family members using fake names. Lynn Barker, a contract financial investigator with the United States Department of Justice's Organized Crime Drug Enforcement Task Force, testified that he tracked down fifty-two such wire transfers sent by Maddox to others between May 2005 and March 2009. These totaled $24,201.00, and were sent from at least sixteen different addresses Maddox used in Tennessee and elsewhere. Barker also found $62,332.00 in wire transfers sent to Maddox in Utica and Rochester, New York, and various areas near Atlanta, Georgia. These transfers were mostly made in amounts less than $1,000, such that the recipient did not have to show identification to receive the cash, or less than

$3,000, so as to avoid federal reporting requirements. Barker found one transfer from Maddox to Cooper for $900 that Cooper received in Utica, New York, on February 24, 2007. The investigator also tracked twenty-two more transfers totaling $8,560.00 from Maddox to his sister, Kizzy Lukerson, who is also Cooper's wife.

Barker also testified that drug-traffickers often use wire transfer services to send money easily and without detection by law enforcement. He explained that, while they often send large amounts of money for purchasing drugs through human couriers, they rely on wire transfers of smaller amounts for unbudgeted expenses that arise when deals do not go as planned.

Cooper concedes that "[i]t is clear that the conspirators used Western Union to transfer money that was the proceeds of illegal activity," but maintains that "no direct evidence" demonstrated that he had the requisite knowledge of and intent to join the conspiracy, or that the money transferred to him was used to promote further illegal activity. By comparison, he argues, he introduced specific evidence that he did not use the $900 to promote the drug conspiracies.[7]

Cooper ignores, however, that the government presented substantial circumstantial evidence to support his conviction. Barker testified that, in his experience, drug traffickers often send wire transfers of small amounts of money during the course of drug deals to cover unanticipated costs that arise, such as a higher asking price for drugs or extended trips. Of the transfers in co-conspirators' names that Barker uncovered, dozens were sent to and from the same areas where Maddox and his collaborators purchased narcotics and conducted activities relating to the drug conspiracies. As to Cooper specifically, not only did he receive at least one

---

[7] According to Cooper's brief, he "introduced evidence [at trial] that the single wire transfer sent to him by Maddox was contemporaneous with his payment to the auto repair shop for the repairs to his transmission." The exhibit Cooper references for this statement, however, is not included in his appeal. A review of testimony from trial reveals only that it was a check from Western Union made payable to Cooper in the amount of $900.

known transfer of $900 that he cashed, but the jury found him guilty of the related drug conspiracies that the wire transfers allegedly promoted and were integral to, such that his knowledge of how the money was used and his intent to join the wire transfer conspiracy reasonably could have been inferred.

    *4.    Witness Intimidation.* Finally, Cooper challenges the sufficiency of evidence leading to his conviction for conspiring to intimidate a witness in violation of 18 U.S.C. §§ 1512(b)(1), 1513(b)(2).[8] This, too, has no merit.

    To prove a witness-intimidation conspiracy, the government must show: "(1) that the conspiracy was wilfully [sic] formed and existed at or about the time alleged in the indictment; (2) that the accused willfully became a member of the conspiracy; (3) that one of the conspirators thereafter knowingly committed at least one over[t] act charged in the indictment at or about the time and place alleged; and (4) that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged." *United States v. Crawford*, 60 F. App'x 520, 533 (6th Cir. 2003) (quoted case omitted). A defendant need not have participated in each overt act in furtherance of the scheme. *Id.* at 534.

    At trial, the government introduced the recording of a voicemail message Maddox left for Rush, calling him a "fucking rat bitch" and threatening that he had "better watch [his] step out there nigga cause [he] ain't safe." Maddox then immediately called Cooper and told him to

---

[8] Section 1512(b)(1) makes it a crime for a person to "knowingly use[] intimidation, threaten[], or corruptly persuade[] another person, or attempt[] to do so, or engage[] in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding." Section 1513(b)(2) makes it a crime for a person to "knowingly engage[] in any conduct and thereby cause[] bodily injury to another person or damage[] the tangible property of another person, or threaten[] to do so, with intent to retaliate against any person for any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings given by a person to a law enforcement officer."

"[g]reen light on" Rush, which an FBI cryptanalyst testified usually means to order to kill or seriously harm a person. Maddox told Cooper that he was "going to smash" and "beat the breaks off" of Rush for cooperating with law enforcement. He also instructed Cooper "if you come in contact [with Rush,] don't let him talk that sweet talk shit" and "make sure he don't talk that love talk with niggas, you know what I mean"—to which Cooper responded, "Yeah no doubt, no doubt" and "No sir."

Maddox then called and told Ruffin that he wanted a "universal beat down" of Rush and wanted to "physically destroy" and "change [Rush's] whole face." Ruffin shared with Maddox that "the goons" had already been sent "out after" Rush.

In addition, Ballinger—the jailhouse informant—testified that Cooper warned him not to snitch on Cooper because "where they from, they kill snitches, and they've got enough money out there to have [Ballinger] and [his] family killed."

Altogether, a reasonable juror could have concluded that Maddox, Cooper, and Ruffin formed a conspiracy to intimidate Rush and took several overt acts in furtherance of it. Cooper argues that, even if "it is certainly evident that Maddox threatened Rush" and intended to further threaten him, there was no evidence of an agreement that Cooper would take action to further Maddox's goal. For support, he points to the fact that he responded to Maddox's "green light" statement by asking "Yeah?" While Cooper expressed initial surprise, he ignores the evidence that he followed his initial "Yeah?" with multiple, affirmative statements that he understood and agreed with Maddox's instructions, and ended the conversation stating several times "yeah" and "alright."

As a result, Cooper's convictions were supported by sufficient evidence.

*E. Dorsey*

Dorsey was convicted of conspiracy to distribute and to possess with the intent to distribute 500 grams or more of cocaine, and of aiding and abetting the possession with the intent to distribute 500 grams or more of cocaine. He argues the government failed to present sufficient evidence because it relied almost exclusively on his presence at the scene of the May 7, 2009, arrest and on testimony by Rush and Sanders, who were not credible witnesses. As discussed above, and as defense counsel surely knows, the role of this Court is not to replace the jury as an arbiter of credibility, but to review the record as it appears before us. Based on this record, the government presented sufficient evidence to convict Dorsey.

Rush testified that Maddox brought Dorsey and Miller to Tennessee from New York in 2004, 2005, or 2006 so that they could sell drugs for him. Though Dorsey was living with Rush and Maddox at the time, Rush's testimony and an April 29, 2009, phone call between Rush and Maddox showed that Maddox was arranging for Dorsey and Miller to live in and monitor a "stash house" down the street from Maddox's apartment where Maddox could cook crack cocaine and store drugs and money. Sanders also testified that Maddox informed him that Dorsey had come to Tennessee to sell drugs.

As for the police search of Maddox's apartment on May 7, 2009, Dorsey was more than an innocent bystander present at the house; the government's evidence showed Dorsey took actions to safeguard the cocaine in the trunk of Ebberts's rental car. Before Ebberts arrived at Maddox's apartment, police officers observed Dorsey leave the apartment several times to look down the road while on the phone. Rush testified that Maddox called Dorsey to warn him that Maddox and Rush had been pulled over by police on their way back from Atlanta. During that call, according to Rush, Dorsey informed Maddox that police were simultaneously at Maddox's

apartment door, and Maddox told Dorsey not to let the police enter. Maddox told Rush that he instructed Dorsey to flush the keys to Ebberts's rental car. For her part, Ebberts testified that Dorsey and Miller were at the apartment when she arrived. When she learned the police were at the door, she called Rush and passed the phone to Dorsey, who left the room with it; Miller then returned with the phone and asked Ebberts to hide the rental car keys. After police officers searched the apartment and arrested Dorsey, Miller, and Ebberts, they found more than one kilogram of cocaine and 67 grams of marijuana in the trunk of the rental car.

Finally, the government introduced evidence that Dorsey and Maddox contacted each other 90 times in the week before the arrest. This circumstantial evidence supports an inference that Dorsey served a role in the plans surrounding the Atlanta cocaine buy. Ultimately, the totality of the evidence supported his convictions.

## V.     DENIAL OF MOTIONS FOR NEW TRIAL & MISTRIAL

### A. Cooper

Cooper argues that the district court erred in denying his motion for a new trial when it determined that the jury's verdict was not against the manifest weight of the evidence. "Generally, such motions are granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *United States v. Hughes*, 505 F.3d 578, 592–93 (6th Cir. 2007) (citation and quotation marks omitted). In this situation, a reversal "is proper when the government has presented sufficient evidence to convict, but the [district court] disagrees with the jury's resolution of conflicting evidence." *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). The court then "can act in the role of a 'thirteenth juror' and consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of

justice." *Id.* We review the trial court's ruling to determine whether it was a clear and manifest abuse of discretion. *Hughes*, 505 F.3d at 593.

In denying Cooper's motion, the district court ran through the same evidence we have discussed regarding Cooper's sufficiency of evidence claim. Cooper's only new argument on appeal is that the district court erred in denying the motion after it acknowledged inconsistencies existed in the testimony of a jailhouse informant and between some witnesses' testimony. However, the district court made clear that, having "heard all the proof at trial and observed the witnesses first-hand," it determined the case was not against the manifest weight of the evidence. The court based this decision on its assessment of the witnesses, the nature of the proof, and the weight of other evidence against Cooper. While Cooper once again presents the inconsistencies in testimony on appeal, nothing in the record indicates to us that the district court abused its discretion in assessing the witnesses' credibility and, as a result, in finding the verdict was not against the manifest weight of the evidence.

### B. *Maddox*

Maddox argues that the trial court erred in denying a motion for mistrial that he filed in response to the government's questions about and references to his religious beliefs. He claims that, "[o]n this ground alone, the entire trial was rendered unfair, a mistrial should have been granted by the trial court, and a new trial should be granted by this Court." We review the district court's denial of a motion for a mistrial for abuse of discretion. *United States v. Martinez*, 430 F.3d 317, 336 (6th Cir. 2005).

At trial, the government introduced evidence that Maddox and various co-defendants used coded language to communicate. As explained by Shawn McGirt, the government's second witness, this included a code for numbers based on the "Supreme Mathematics" system

employed by members of the Five Percent Nation (or "Five Percenters"), a group affiliated with the Nation of Islam.

Testimony regarding the Five Percenters came up three times at trial. First, the government played a recorded phone call between McGirt and Maddox in which McGirt ordered 500 grams of cocaine. On the call, McGirt told Maddox, "I'm trying to receive some Power, Cipher, Cipher when I get there." McGirt testified that "power, cipher, cipher" meant 500 because "power" represented "five" and "cipher" meant "ten" in the Five Percent Nation's Supreme Mathematics system. When asked to explain what the Five Percent Nation was, he said, "Well, it's the Nation of Islam."

Maddox's counsel immediately objected to the mention of Islam, arguing in a sidebar that "bringing up . . . Islam in these times in highly prejudicial." Noting that discussion of the code was admissible, the court overruled the objection, but admonished the government not to "go into pursuing the religious aspect of it."

Several days later, the government asked Rush if he was familiar with the term Five Percenter. He responded: "Yes, Sir. A Five Percenter is a person who don't believe in God, which I do. A Five Percenter is a person who believe that they are God, that they control their own destiny." Maddox's counsel immediately objected, and the court instructed the jury to disregard the statement. Rush then continued by testifying about his understanding of the Supreme Mathematics code. After a break, Maddox's counsel moved for a mistrial, which the court denied.

Finally, after Maddox took the stand one week later, the government asked him on cross examination, "what does it mean to be a Five Percenter?" Maddox refused to answer the

question, which his counsel then objected to, and the government agreed to move on in its questioning.

In considering whether improper statements made by a witness at trial warrant granting a mistrial, this Court considers five factors: "(1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant." *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003) (citing *United States v. Forrest*, 17 F.3d 916, 920 (6th Cir. 1994)). In addition, "[g]enerally, 'the subsequent striking of erroneously admitted evidence accompanied by a clear and positive instruction to the jury to disregard it cures the error' unless the stricken evidence is so prejudicial that its harmful effect cannot be eliminated." *United States v. Chambers*, 944 F.2d 1253, 1263 (6th Cir. 1991) (quoting *United States v. Greene,* 400 F.2d 847, 848 (6th Cir. 1968)), *superseded on other grounds by statute as recognized in United States v. Avery*, 128 F.3d 966, 972 (6th Cir.1997).

Based on these factors, it is clear that McGirt's and Rush's comments did not warrant a mistrial, and the district court did not abuse its discretion in denying Maddox's motion. First, the government had reason to ask McGirt to explain the context of a code he used in a recorded conversation he had with Maddox. When he responded that the code came from the Five Percent Nation's Supreme Mathematics system—terms likely unfamiliar to an average juror—the government reasonably asked McGirt to explain what the Five Percent Nation is. The government did not launch a fishing expedition into Maddox's beliefs by asking these basic questions, and McGirt's matter-of-fact response that the Five Percent Nation "is the Nation of Islam" was neither inappropriate nor unduly prejudicial on its own.

By contrast, Rush's comment about Five Percenters not believing in God was inappropriate, but did not warrant a mistrial under the *Forrest* factors. The remark came unsolicited, as the government asked Rush if he was familiar with the Five Percent Nation, not to explain the group's religious beliefs. He began by answering, "yes, sir" before beginning an unsolicited repudiation of the Five Percenters' beliefs. But, in asking Rush about his familiarity with the Five Percent Nation, the government appeared to be reasonably laying the foundation to elicit testimony from Rush about Supreme Mathematics specifically. (It questioned Rush about this soon after Maddox raised the objection.)

Undoubtedly, the government could have asked Rush if he was familiar with Supreme Mathematics, rather than asking first if he was familiar with the Five Percent Nation and risking drawing an objectionable response. That said, the two subjects—Supreme Mathematics and the Five Percent Nation—appear so intertwined in practice that a witness like Rush speaking to his familiarity with the code likely could not explain one without at least mentioning the other.

In addition, the government realized the impropriety of the response and did not object to striking the remark. The Court then immediately and clearly instructed the jury to disregard the testimony. Ultimately, this comment formed only a tiny part of the evidence presented at trial, which lasted ten days and included testimony by almost forty witnesses.

Nonetheless, Maddox argues Rush's comment was grounds for a mistrial because it was unduly prejudicial and was "a bell that could not be un-rung." This Court does not agree. The statement, while inappropriate, had nothing to do with the substance of the charges in the case and was so irrelevant to the issue of guilt that it could easily have been ignored by the jury, which was presented with overwhelming evidence of Maddox's role in the drug-trafficking

operation. As was in its discretion, the trial court immediately instructed the jury to disregard the statement. *See* Fed. R. Evid. 403.

As for the government's direct question to Maddox, the issue is one of prosecutorial misconduct.[9] "When reviewing claims of prosecutorial misconduct [based on statements made by the government's counsel], we determine first whether the statements were improper. If they appear improper, we then look to see if they were flagrant and warrant reversal." *United States v. Tarwater*, 308 F.3d 494, 511 (6th Cir. 2002) (citations omitted).

Here, the government's statement—a question to Maddox about what the term "Five Percenter" means—does not appear to have been improper, though it may very well have been extraneous or even deliberately provocative before a hostile witness. Again, this question related to an admissible subject of testimony: the code Maddox and some co-defendants used to communicate. The question itself did not ascribe any beliefs to or make judgments about Five Percenters—it simply asked Maddox to describe them. In addition, there is no evidence that the government posed the question in bad faith. Once Maddox's counsel objected, the prosecution immediately agreed to move on.

Nonetheless, on appeal, Maddox cobbles together a pastiche of reasons why the statement was improper. First, he suggests the question was inappropriate in light of the religious freedoms guaranteed by the First Amendment, but stops short of arguing the government violated any First Amendment protections.[10] ("The government's repeated trespasses . . . are in

---

[9] The district court ruled on the motion for mistrial before the government cross-examined Maddox, and Maddox did not renew his motion after the government's allegedly improper question. Neither party addresses this timing issue. However, this Court will treat the government's question as supporting Maddox's motion for mistrial.

[10] Maddox broadly characterizes all three statements as "the government's actions," which he finds objectionable under the First Amendment. However, the first two comments were made by

the vein of the very type of government conduct against which the First Amendment is meant to be an absolute prohibition.")  This Court declines to entertain the suggestion that a First Amendment violation has occurred; Maddox cannot seriously argue that the First Amendment serves as an absolute bar to government questioning of a witness on a question relevant to proving a defendant took part in illegal activity—however benign the government's question— simply because the answer touches upon a person's belief system.

Next, Maddox suggests the government's question served to recall prior witnesses' unduly prejudicial testimony and "was an apparent attempt to attack his credibility," in violation of Federal Rules of Evidence 403 and 610.  *See* Fed. R. Evid. 610 (2010) (amended 2011) ("Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced.").  First, no actual violation of the rules of evidence occurred here, as a lawyer's unanswered question is not evidence.  Second, Maddox offers no argument or actual evidence to show that the government intended to elicit improper testimony from Maddox.  As discussed above, nothing in the record suggests that the government acted in bad faith in questioning witnesses about the Five Percent Nation, or that its broad question to Maddox was an attempt to ridicule him or undermine his credibility.  The use of the Supreme Mathematics code was a relevant fact at trial.  In this context, that Maddox's substantive beliefs may be unpopular or out of the mainstream alone does not suffice to make the government's question improper.

As a result, the district court did not err in denying Maddox's motion for mistrial.

---

McGirt and Rush.  If he assumes that their comments should be considered government action because they served as witnesses for the prosecution, he has not argued this.

## VI.    VARIANCE

As to his drug and money-laundering convictions, Cooper argues for the first time on appeal that the proof at trial showed multiple conspiracies—and not the single conspiracies he was charged with—creating impermissible variances to the indictment. Because he did not raise this as an objection before the district court, we review the claim for plain error on appeal. *United States v. Kuehne*, 547 F.3d 667, 682 (6th Cir. 2008).

"A variance occurs when 'the charging terms [of an indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir. 1986) (quoted case omitted). A variance does not constitute reversible error, unless the defendant can prove it affected his "substantial rights," because it either prejudiced his defense, the fairness of trial, or the indictment's sufficiency to bar subsequent prosecutions. *Id.* at 910–11.

A defendant may show that a variance occurred in a conspiracy case, "[i]f an indictment alleges one conspiracy, but the evidence can reasonably be construed only as supporting a finding of multiple conspiracies." *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982). To prove a conspiracy, "the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal"; however, "a single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member." *Id.* at 549 (citations and quotation marks omitted). This Court has recognized this is particularly relevant in drug-trafficking conspiracies. "Conspiracies to distribute narcotics, which normally involve numerous sales and resales of drugs until they reach the ultimate consumers, are often 'chain' conspiracies," in which "the agreement can be inferred from the interdependent nature of the criminal enterprise." *Id.*

(citations omitted). "Because the success of participants on each level of distribution is dependent upon the existence of other levels of distribution, each member of the conspiracy must realize that he is participating in a joint enterprise, even if he does not know the identities of many of the participants." *Id.*

Cooper argues "there is insufficient evidence to demonstrate he joined the Tennessee conspiracy" or that he shared a common goal with the conspirators because, at most, the government showed he conspired in a separate conspiracy with Maddox in New York. As discussed above, this not only understates the evidence, it ignores the geographic scope of the Maddox conspiracy presented at trial.

By all accounts, Maddox served as the central figure to the drug and money-laundering conspiracies that spanned several states. The evidence, viewed in the light most favorable to the government, showed Maddox and his co-conspirators operated a network that bought and sold cocaine and marijuana, and cooked crack cocaine, which they also sold. Not only did Maddox come from New York originally, he recruited many of his co-conspirators from there and maintained contact with others. Maddox also traveled to New York regularly during the course of the conspiracy and would continue the work of the conspiracy in New York by purchasing narcotics and cooking crack cocaine. In addition, he sent female couriers to ferry his associates and pick up drugs from suppliers in New York, Florida, and Georgia. Following this interstate supply chain was a money-wiring scheme that flowed from Tennessee to New York, Florida, and Georgia, as well.

The evidence at trial presented Cooper to be one of Maddox's surrogates, conducting retail sales, buying kilograms of cocaine, and operating "trap houses" from which he sold crack

cocaine. In this sense, his role was intertwined and interdependent on the other members of the conspiracies, even if he did not work with them directly.

Because the jury could easily construe the evidence to show only one conspiracy for each count, no variance existed between the proof and the indictment.

## VII. SENTENCING

Carr, Cooper, DeJesus, Maddox, Miller, and Ruffin all challenge their sentences on appeal. Although there were threats made, there was no violence committed, and so the defendants are non-violent minority drug dealers. The Government asked for long sentences under the sentencing Guidelines, including life imprisonment for Maddox and very long sentences for others. This Court must review sentencing decisions under an abuse-of-discretion standard to determine if they are reasonable. *Gall v. United States*, 552 U.S. 38, 46–51 (2007).

Under this review, we "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence— including an explanation for any deviation from the Guidelines range." *Id.* at 51. We then "consider the substantive reasonableness of the sentence imposed," and "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* We may apply a presumption of reasonableness for sentences within the Guidelines range. *Id.* However, "[t]he fact that [we] might reasonably have concluded that a different sentence was appropriate"—or that the sentence is too long—"is insufficient to justify reversal of the district court." *Id.*

### A. Carr

After the jury found Carr guilty of cocaine, cocaine base, and money laundering conspiracies, the district court sentenced him to a term of 235 months' incarceration (almost twenty years) and five years' supervised release. Carr argues that his sentence is both procedurally and substantively unreasonable because the district court did not make an independent finding of fact regarding the quantity of drugs in the cocaine conspiracy attributable to him only. We review a district court's determination of the quantity of drugs attributable to a defendant for sentencing purposes for clear error. *United States v. Jackson*, 470 F.3d 299, 310 (6th Cir. 2006).

As to the cocaine conspiracy, Carr's Presentence Investigation Report stated he would be held accountable for five kilograms of cocaine. He states this was based on one fact: the jury found him guilty of conspiracy to distribute and to possess with the intent to distribute five kilograms of cocaine. Given this basis, he argues that (1) the district court was not bound by the jury's factual finding regarding the five kilograms because the drug quantity was not an element of the offense, and (2) the court had an obligation to make particularized findings of fact regarding Carr's role in the conspiracy in order to sentence Carr for the quantity of cocaine that it determined he was actually responsible for. Because the trial court failed to make any "independent determination" as to this quantity, he argues, this Court should remand his case for re-sentencing.

However, not only is Carr's legal assumption regarding the elements of his offense questionable under *Alleyne v. United States*, 133 S. Ct. 2151, 2155, 2163 (2013) (holding that a fact constitutes an element of an offense if it increases the penalties to which the defendant is subjected), but his factual basis is simply incorrect.

The presentencing report did not base its conclusions regarding Carr's responsibility for the cocaine conspiracy on the verdict only. The report specifically detailed the government's evidence against Carr at trial, including testimony from Rush and Campbell, as well as recorded conversations that all tied Carr to large purchases of powder cocaine. Based on this information *and* the jury verdict, the report concluded Carr would be held accountable for five kilograms. It stated that the corresponding guideline range for a total offense level of 36 with Carr's criminal history category of III was 235 to 293 months' imprisonment. In addition, Carr faced a mandatory minimum of ten years and a maximum sentence of life on the cocaine conviction. As was within the court's discretion, it sentenced Carr to the bottom of his Guidelines range established in these drug cases by the Sentencing Commission.

Because the district court had factual support for its conclusion, it did not clearly err in determining the quantity of drugs attributable to Carr, and his sentence was not unreasonable.

### B. Miller

Miller's only claim on appeal is that the district court erred in failing to consider whether he was entitled to a minor-role sentence reduction under U.S.S.G. § 3B1.2, based on his limited role in the conspiracy. Whether a defendant is entitled to a reduction for his role in the offense depends heavily on factual determinations, which we typically review for clear error. *United States v. Bailey*, 488 F.3d 363, 369 (6th Cir. 2007). "The defendant has the burden of proving by a preponderance of the evidence that he is entitled to the reduction." *Id.* When a defendant fails to request such an adjustment before sentencing, we review for plain error. *United States v. Cobb*, No. 96-5449, 114 F.3d 1189, 1997 WL 289701, at *1 (6th Cir. 1997) (table decision).

Section § 3B1.2 of the Guidelines allows a district court to decrease a defendant's offense level by two levels if he "was a minor participant in any criminal activity" and by up to four

levels if he "was a minimal participant." The application note for the Guideline explains that "[t]his section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2, cmt. 3(A). However, "where a defendant plays a less significant but nevertheless 'pivotal,' 'vital,' or 'necessary' role in the relevant criminal activity, it is not error to deny him an adjustment as a minor participant." *Cobb*, 1997 WL 289701, at *2 (citations omitted). In addition, "[d]efendants may be minimal or minor participants in relation to the scope of the conspiracy as a whole, but they are not entitled to a mitigating role reduction if they are held accountable only for the quantities of drugs attributable to them." *United States v. Campbell*, 279 F.3d 392, 396 (6th Cir. 2002).

Miller failed to raise this § 3B1.2 reduction objection in his presentencing memorandum or at the sentencing hearing, and the district court did not address the issue sua sponte. On appeal, Miller argues that the evidence showed that he served as a simple courier for what appeared to be an out-of-state purchase of an unknown quantity of a drug; delivered some cocaine to Maddox's customers at Maddox's direction; and, at most, transmitted messages and followed orders from Maddox on May 7, 2009, the day that Maddox, Rush, and Ebberts were arrested transporting more than a kilogram of cocaine from Atlanta to Johnson City. The jury, nonetheless, convicted him on one count of conspiracy to distribute and to possess with the intent to distribute between 500 grams and five kilograms of cocaine, and one count of aiding and abetting possession with intent to distribute 500 grams or more of cocaine. Because he did not directly take part in the drug deal that occurred on May 7, 2009, however, he argues he had a minor role in the conspiracy for which he was convicted.

The government offers little by way of a counter-argument other than to state that evidence showed Miller "actively sold drugs" and that his sentence was lower than other coconspirators' sentences. This comparison, however, is inapt; application note 3(A) to section 3B1.2 requires the court to compare a defendant's role in the conspiracy to that of the average participant, not to compare their sentences.

These facts present a close call. The evidence showed Miller's role on May 7, 2009, was particularly limited: while other co-conspirators rented cars, transported money to Atlanta and drugs back to Johnson City, and arranged the purchase and conducted the transaction, Miller stayed at Maddox's home, waiting for Ebberts's arrival. There is no evidence he did anything with drugs she couriered, as they were found in the trunk of her parked car and not inside the home. The extent of his activity involved asking Ebberts to hide the rental car keys when the police descended on the home.

If the district court also held Miller accountable for his role in the broader conspiracy— and it's unclear if it did or not—we might determine this role was similarly limited compared to others. First, Rush testified that Maddox brought Miller to Tennessee several times to sell drugs. Rush witnessed Miller sell eight-ball and $50 quantities of crack cocaine, and give Maddox $300 and $500 for the eight-balls he sold. Next, Campbell, the courier, connected Miller to what appears to be one cocaine purchase: she testified that Miller escorted her in a separate car on a trip in which she couriered two unmarked duffle bags from Tennessee to Atlanta and then New York, where Miller took the bags out of her car. Finally, Maddox indicated that he was arranging for Miller to live in and monitor a stash house, though this act had not yet occurred.

By contrast, others in the conspiracy had more responsibility and dealt with larger quantities of drugs. On a routine basis over the course of six years, they regularly arranged the

purchase of kilogram quantities of cocaine from suppliers in other states. They then cooked the cocaine into crack cocaine and distributed it. Rush, for one, estimated he cooked forty kilograms of cocaine into crack cocaine for Maddox. Limited evidence connected Miller to the purchase of cocaine and none to its cooking.

While these facts show that Miller was possibly eligible for the minor-role reduction, we cannot conclude plain error occurred here. Miller has not cited—and we have not found—any cases in which we have remanded a sentence for a minor-role reduction on similar facts. By contrast, we have upheld the district court's denial of the minor-role reduction in several cases of low-level drug couriers with similar levels of involvement in the offenses in which they were convicted. *See, e.g.*, *United States v. Salas*, 455 F.3d 637, 643–44 (6th Cir. 2006); *United States v. Quijada*, 307 F. App'x 986, 991 (6th Cir. 2009). As we have often concluded, simply because a district court *could* have applied the reduction does not mean it was *required* to do so. *See Salas*, 445 F.3d at 643.

## *C. Cooper*

*1. Career-Offender Status.* In challenging his sentence, Cooper first argues that the district court erroneously treated a juvenile offense as a predicate conviction so that he was subjected to a career-offender enhancement on his sentence. While this Court reviews the underlying findings of fact in a district court's sentencing calculations for clear error, the district court's conclusions of law are reviewed de novo. *United States v. Galloway*, 439 F.3d 320, 322 (6th Cir. 2006).

Cooper's presentencing report classified him as a career offender under section 4B1.1(a) of the sentencing guidelines based on two past offenses. The first of these was for the possession and sale of a controlled substance in the third degree in May 1993, when Cooper was 17.

According to the report, Cooper pled guilty to the offense in 1995, was adjudicated a youthful offender, and was sentenced to six months' imprisonment and five years of probation. However, he then violated parole in 1999 and was resentenced to one to three years' imprisonment. The report determined that Cooper had five criminal history points and a criminal history category of III; however, his career-offender status enhanced this to criminal history category VI and a Guidelines range of 360 months to life.

Under section 4B1.1 of the sentencing guidelines, a defendant is classified as a career offender if, among other requirements, he "has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). The application note of the sentencing Guidelines defining these terms explains: "'Prior felony conviction' means a prior *adult* federal or state conviction for an offense punishable by death or imprisonment for a term exceeding one year." U.S.S.G. § 4B1.2 cmt. 1 (emphasis added). It adds, "[a] conviction for an offense committed prior to age eighteen is an adult conviction if it is classified as an adult conviction under the laws of the jurisdiction in which the defendant was convicted." *Id.*

The question here, then, is whether Cooper's 1993 youthful offender adjudication "is classified" as an adult conviction under New York law so as to constitute a "prior felony conviction" for purposes of the career-offender Guidelines.

Under New York law, a youth charged with a crime committed when he was between sixteen and eighteen years old may, under certain conditions, be adjudicated as a "youthful offender." N.Y. Crim. Proc. Law §§ 720.10(1)–(2), 720.20(1)–(3). This allows for the instrument charging him to be sealed at the front end of the prosecution, *id.* §720.15, and—once he is convicted—for the court to vacate and replace his conviction with a "youthful offender finding" and impose a "youthful offender sentence," *id.* §§ 720.10(4)–(5), 720.20(1)–(4).

Cooper argues this adjudication does not constitute an adult conviction because the youthful-offender adjudication process is a "hybrid" system that forcibly treats offenders not quite as adults, but not as juvenile delinquents, either. Specifically, while youthful-offender adjudication proceedings take place in adult court and offenders may serve time in adult facilities, state law provides that the "adjudication is not a judgment of conviction for a crime or any other offense." *Id.* § 720.35. He notes that this type of adjudication cannot be used for enhanced sentencing under state law. *See People v. Kuey*, 631 N.E.2d 574, 576 (N.Y. 1994).

The government highlights, and Cooper acknowledges, that three other circuits have determined that a youthful-offender adjudication in New York constitutes a career-offender predicate offense because "an adult 'conviction' is a necessary prerequisite'" to the adjudication. *See e.g.*, *United States v. Wallace*, 663 F.3d 177, 181 (3d Cir. 2011); *United States v. Peralta*, 457 F.3d 169, 171 (1st Cir. 2006); *United States v. Jones*, 415 F.3d 256, 263 (2d Cir. 2005). In *Jones*, for instance, the Second Circuit reasoned that "the substance of the proceedings" made the adjudication an adult conviction, even if the state explicitly chose not to label it as such. 415 F.3d at 263–64.

Based on these cases and Sixth Circuit case law, we agree with the district court that Cooper's 1993 youthful-offender adjudication must be counted toward his career-offender status. In evaluating whether convictions of minors count as "adult convictions" under § 4B1.1, this circuit—like the Second Circuit—has focused on the characteristics of the crime and proceedings leading to the conviction. *See United States v. Muhammad*, 948 F.2d 1449, 1459 (6th Cir. 1991) (a prior conviction of an "adult" crime in "adult" court counts as a "prior adult" conviction, even though the defendant was a minor at the time); *see also United States v. Hinds*, 2 F. App'x 420, 424–25 (6th Cir. 2001) (a defendant's prior conviction properly counted as a predicate offense

because, "although he served his time in a juvenile facility, he was tried and convicted in adult court"). As interpreted, the application note appears to take any discretion to treat a prior offense as a juvenile crime away from the sentencing judge and vest it in the discretion of the state prosecutor's office.

Here, New York's "youthful offender adjudication" designation did not change the underlying adult nature of Cooper's crime and conviction; it simply offered him certain protections and rights at the bookends of the process. Those protections were offered in light of the fact that he was tried and convicted as an adult, rather than as a juvenile delinquent. In other words, the adult conviction served as a prerequisite to this treatment. And, strangely, while New York may not count these adjudications as convictions for purposes of sentence enhancements under state law, we seem not to be bound by the state's interpretation for federal sentencing purposes under the Guidelines. *See, e.g.*, *United States v. Miller*, 434 F.3d 820, 824 (6th Cir. 2006) ("It has long been recognized that alternative sentencing such as that utilized by Georgia in its first-offender provision does not prevent the underlying offense from being treated as a prior conviction for purposes of federal sentencing statutes.").

2. *Procedural & Substantive Unreasonableness.* Cooper next argues that his sentence is procedurally and substantively unreasonable because the district court failed to explain why it denied his motion for a downward departure and failed to consider the sentencing factors under 18 U.S.C. § 3553(a). Because Cooper did not object before or after the court asked the *Bostic* question at his sentencing hearing, we must review this challenge only for plain error. *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc).

When a defendant has been sentenced within a Guidelines range, the question on appeal must be limited to whether the sentencing record "'makes clear that the sentencing judge listened

to each argument,' 'considered the supporting evidence,' was 'fully aware' of the defendant's circumstances and took 'them into account' in sentencing him." *Id.* at 387 (quoting *Rita v. United States*, 551 U.S. 338, 358 (2007)). While a district court must give the reasons for its sentence, a district court need not "give the reasons for rejecting any and all arguments by the parties for alternative sentences." *Id.*

Cooper's presentencing report called for a Guidelines sentence of thirty years. Cooper objected to the report on several grounds, which the district court addressed and rejected ahead of the sentencing hearing. In a brief sentencing memorandum, Cooper requested a downward departure to the mandatory ten-year minimum sentence.

At the sentencing hearing, the court explicitly stated that it had received and read letters from Cooper and his family. It also acknowledged that Cooper "ha[d] filed a motion for a downward variance to a mandatory minimum sentence of 120 months," though it did not discuss his request further. The court also stated that

> [it] has *considered the nature and circumstances of the offense, the history and characteristics of this defendant*. Of course, the court was here for nearly four weeks during the trial and heard testimony from all of the witnesses, so it's not necessary at this time to review all of those factors. The court is aware of the fact that this defendant was found guilty of count 20 by the jury, count 20 being conspiracy to engage in witness tampering or retaliation against an informant, in violation of Title 18[] U.S.C. section . . . 1512(b)(1) and 1513(b)(2), which is a class c felony. *The court has considered the advisory guideline range as well as the factors* listed in Title 18 U.S.C. section . . . 3553(a), and pursuant to the Sentencing Reform Act of 1984, it is the judgment of the court that the defendant, Ronnie Cooper, is hereby committed to the custody of the bureau of prisons to be in prison for a term of 360 months.

Cooper argues this concise recitation of the sentencing factors—rather than detailed explanation for the district court's decision—makes his sentence unreasonable. However, the district court's

statement here was almost identical to that which we upheld against a similar challenge in

*Vonner*. *See* 516 F.3d at 386–88. There, the court also failed to address the merits of the

defendant's four-part motion for a variance and simply stated that it had considered the § 3553(a)

factors. *Id.* Noting the "sizeable gap between good sentencing practices and reversibly bad

sentencing practices," we refused to reverse the sentence, as there was no indication the district

court had failed in its statutory duty to analyze the § 3553(a) factors in determining the

defendant's sentence. *Id.* at 389. Similarly here, the district court explicitly stated that it

received Cooper's motion and considered the appropriate factors. Cooper's motion itself was

straightforward: he maintained his innocence, restated several biographical facts that had already

come out at trial, and listed the family members who supported the reduced sentence. The

district court explained that it had read letters from Cooper's family and had taken Cooper's

"history and characteristics" into account, after having observed the trial. Based on this

explanation, the court did not plainly err.

### D. DeJesus & Ruffin

In 1986, Congress enacted the Anti–Drug Abuse Act, 100 Stat. 3207, which set forth

mandatory minimum penalties of five and ten years depending primarily upon the kind and

amount of drugs involved in the offense. To relieve a gross disparity between the penalties for

cocaine and crack cocaine offenses, Congress passed the Fair Sentencing Act of 2010, 124 Stat.

2372, which increased the amount of crack cocaine needed to trigger these mandatory

minimums.

In *Dorsey v. United States*, the Supreme Court held that the Act's reduced penalties

applied to those who committed a qualifying offense before the Act was enacted on August 3,

2010, but who were sentenced after its enactment. 132 S. Ct. 2321 (2012). Relief under *Dorsey*

is limited to this narrow tranche of offenders, however, and does not apply to pre-Act offenders with pre-Act sentences. *United States v. Blewett*, 2013 WL 6231727 (6th Cir. 2013) (en banc).

*1.     DeJesus.*  DeJesus was sentenced on August 30, 2011, for two convictions of conspiracy to distribute and to possess with the intent to distribute 500 grams or more of cocaine (Count 1) and fifty grams or more of cocaine base (Count 5).  While the Presentence Investigation Report indicated that DeJesus's total offense level of 30 and criminal history category of III corresponded to a range of 121 to 151 months, it concluded that a pre-Act twenty-year mandatory minimum restricted the range to twenty years.  DeJesus objected to the report, requesting the district court apply the Act's reduced penalties.  The district court declined to do so and sentenced DeJesus to twenty years' imprisonment.

On appeal, both DeJesus and the government agree that DeJesus qualifies for re-sentencing pursuant to the Fair Sentencing Act in light of *Dorsey*.  Given that DeJesus falls squarely within *Dorsey*'s holding, we agree and remand DeJesus's case to the district court for re-sentencing pursuant to the reduced penalties afforded by the Act.[11]

*2.     Ruffin.*  Ruffin also argues he qualifies for *Dorsey* relief under the Fair Sentencing Act.  Though the district court sentenced Ruffin on September 30, 2011—well after the Act's enactment—it explicitly rejected a request by Ruffin to apply the Act's provisions to his sentence, based on the law of the circuit at the time.

On appeal, Ruffin and the government agree that his Guidelines range would not change under the Act.  Even so, Ruffin argues that we should remand his case for re-sentencing to provide the district court the opportunity to revisit its decision based on the Act's policies.  For

---

[11] DeJesus makes several other arguments regarding the constitutionality of his twenty-year mandatory minimum sentence.  We decline to address these in light of the remand for re-sentencing.

support, he cites our unpublished decision in *United States v. Boyd*, 478 F. App'x 323 (6th Cir. 2012) (per curiam), in which we remanded a case for re-sentencing in light of *Dorsey*, even though we determined the defendant's objection to his sentence on appeal was without merit. The trial court in *Boyd* had similarly rejected the defendant's request to grant a downward variance based on the Act, though it did grant one on a different basis. *Id.* at 324. We concluded that "[i]t may well be that the district court, now aware of the subsequent decision in *Dorsey*, might well conclude that an additional variance is justified." *Id.*

Here, the district court did not grant a downward variance from Ruffin's thirty year Guidelines range, despite argument from Ruffin that his medical condition merited special consideration. Nonetheless, because the district court did not state whether its sentencing decision would have differed had it applied the Act, we remand the case to the district court to reconsider the sentence in light of the Act and *Dorsey*.[12]

### E. Maddox

Finally, the district court sentenced Maddox to imprisonment for the rest of his life, under 21 U.S.C. § 841(b)(1)(A), based on his two prior drug felony convictions. Maddox challenges

---

[12] As with DeJesus, we decline to address Ruffin's additional arguments that the sentence was procedurally and substantively unreasonable. Finally, the district court may consider whether DeJesus and Ruffin qualify for additional relief based on changes to the Department of Justice's policy for sentencing in drug cases, in particular a new mandate that federal prosecutors refrain from seeking recidivist enhancements for qualifying defendants. Memorandum from Att'y Gen. Eric Holder for U.S. Attorneys, Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases (August 12, 2013), http://www.justice.gov/ oip/docs/ag-memo-department-policypon-charging-mandatory-minimum-sentences-recidivist-enhancements-in-certain-drugcases.pdf; *see also* Memorandum from Att'y Gen. Eric Holder for U.S. Attorneys, Retroactive Application of Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases, at 2 (August 29, 2013), *available at* http://www.documentcloud.org/documents/798058-ag-memo-to-usas-and-aag-crm-re-retroactivity-of.html ("encourag[ing]" prosecutors to apply the policy and withdraw 21 U.S.C. § 851 informations for qualifying, convicted defendants awaiting sentencing).

this sentence on two constitutional grounds—both foreclosed by Supreme Court and this Court's precedent.

First, Maddox argues that his sentencing enhancement violated the Sixth Amendment because it was based on facts (his prior convictions) that the jury did not find by proof beyond a reasonable doubt. The Supreme Court has explicitly held that a judge may consider a defendant's prior convictions in applying sentencing enhancements without violating the defendant's Sixth Amendment rights. *Almendarez-Torres v. United States*, 523 U.S. 224, 239–47 (1998). Even as the Court has expanded the universe of facts that a jury must find by proof beyond a reasonable doubt, it has explicitly not overruled this decision. *See Alleyne*, 133 S. Ct. at 2160 n.1.

Second, Maddox argues that "evolving standards of decency" indicate that the mandatory minimums under 21 U.S.C. § 841(b)(1)(A), broadly, are cruel and unusual punishment in violation of the Eighth Amendment. He cites surveys that indicate mandatory minimums for non-violent crimes are unpopular and that most Americans believe that courts—not legislatures—should determine criminal sentences. For that reason, he argues, "there is a significant trend among the states to reform or eliminate mandatory minimums."

This is not an open question for us because we must abide by Supreme Court precedent, no matter how much we may disagree. The Supreme Court has made clear that, for non-capital sentences, the Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime" and that even a sentence of life without parole is not grossly disproportionate for the crime of possessing 650 grams of cocaine. *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J.) (citation omitted). Based on *Harmelin*, this Court has repeatedly upheld the mandatory minimum provisions that Maddox now challenges. *See, e.g.*,

*United States v. Kelsor*, 665 F.3d 684, 701 (6th Cir. 2011) (noting that "this court has held that imposition of a life sentence without parole for a third felony drug conviction is not 'grossly disproportionate' to the crime."); *United States v. Hill*, 30 F.3d 48, 50–51 (6th Cir. 1994) (upholding a mandatory term of life imprisonment without release under 21 U.S.C. § 841(b)(1)(A)(iii) for a defendant with two prior drug felonies).  Maddox's life sentence, therefore, falls well within the bounds found acceptable by Supreme Court precedent binding on this Court.

## VIII.   CONCLUSION

For the reasons stated above, we **AFFIRM** defendants' convictions.  As to DeJesus and Ruffin, we **REMAND** their cases to the district court for re-sentencing.